Good morning. We're ready to call our first case, Mack v. Yost. Counselor, you may proceed. Good morning, Your Honors. May it please the Court, my name is Jessica Moran. I am counsel for the appellant, Mr. Charles Mack. The question before the Court today is simple. It is whether the defendants are entitled to qualify immunity for their months-long campaign of repeated, intentional, and malicious harassment of Mr. Mack on the basis of his religion. And the answer to that question is equally as simple as the question itself. The answer is no. Can we start with whether there's qualified immunity even available? From your August 22nd letter, it appeared that you may be conceding that qualified immunity is available in RFRA cases. Is that right? That is an issue that we did not raise in our summary judgment briefing, and it is an issue that we didn't raise in our initial briefing before the Court. All that being said, Your Honor, my colleague and amicus, Mr. Scotchpole, is going to address that particular issue in greater depth. The amicus brief does allude to that, though, does it not? It does. Judge Jordan has stated that. Yes, it does. The amicus brief takes the position, and we don't dispute that position, that qualified immunity is not available in RFRA cases. Do you have any case law supporting the proposition that when a party forfeits an argument, the argument can be brought back to life by an amicus? That is an issue that I don't know that we would necessarily contend we haven't waived that issue, Your Honor. You said you didn't raise it below, so under our forfeiture doctrine, it's clearly forfeited since you didn't raise it. I don't think that I would necessarily disagree with that, Your Honor. In fact, it was addressed by the District Court in his opinion, was it not? That's correct. The District Court briefly addresses that issue and notes, and I believe it's in a footnote, that we did not dispute the availability of RFRA in our summary doctrine. Then where did you raise it here on appeal? Did you raise it on appeal? We have not raised that issue on appeal. Is there any case law supporting the proposition that an amicus can resurrect a claim that was not pressed on appeal by a party? Not to my knowledge, Your Honor, no. And you do argue the merits in the merits. You didn't say it doesn't apply. You talked about how qualified immunity applies in the RFRA context. Yes, Your Honor. I believe that there were two sort of questions posed by that letter request for supplemental briefing, whether it applies, which is an issue, again, that we don't contest. However, our amicus is here today to discuss that in greater detail and under what circumstances under which qualified immunity applies. And our contention is that given the defendant's intentional, repeated, and malicious harassment on the basis of Mr. Mack's religion, this is clearly a case in which qualified immunity does not apply. It's a situation where the... Well, let's talk about the specificity with which the right has to be defined. You'd agree that the right, the Supreme Court said many times, it can't be too high on the ladder of abstraction. You have to define the right that's at issue with some specificity. Can you tell us where in your briefing you have been specific about the right here? I mean, you've said you can't abuse people in a way that causes them not to exercise their freedom of religion. And that's absolutely true. But that's a very general statement. Have you defined the right any more specifically than that? I think it is, from my view, Your Honor, it is sort of a two-pronged sort of analysis. The first is that, as you noted, it is a violation of RFRA for a defendant to directly or indirectly coerce an individual in a way that interferes with their practice of religion. Could I stop you right there? Because I do have a question about that terminology. And I believe you've classified this as an indirect pressure. What is the meaning, what is the import, I should say, of that language? And let me direct your attention specifically to one of the alleged episodes that occurred with respect to Mr. Mack, which was, I'll use the word interference, I'll use the word interruption of his prayer. Was that direct or indirect? And just how much work is the term indirect and direct doing here? Frankly, Your Honor, I think it's sort of a distinction without a difference, especially in the instance where you note where the defendants were coming into Mr. Mack's prayer space and physically intimidating him and also interrupting his prayers by knocking down boxes and otherwise engaging in inappropriate contact. I think that's an instance where... Where does physically intimidating come from in the prayer context? As I read the record, they were obnoxious in the extreme. I mean, they were, if we take the complaint on its face, they were making noises deliberately to disturb him. But you've just added a different fact here. And it goes to your point in answer to Judge Smith's question that direct and indirect are... That's a distinction without a difference. Really? If they came and they picked him up and they said, stop praying, that would be a direct interference. Are you saying there's no difference between that and making loud noises or something like that? I think to answer your first question, with respect to sort of physical intimidation, they were knocking down boxes and sort of otherwise intruding in the space. And I think one could say that that is physically intimidating. With respect to your point about the distinction between direct and indirect, I think it's a distinction without a difference in that the case law is clearer than an indirect interference with one's religious practice is just as much of a violation of RFRA as if they had come into the prayer space handcuffed. What case clearly establishes that law? Ling does, which is... Decided in what year? I want to say 1983. We're out of water under the bridge since 1983. I agree with that. And I would note too that Ling is actually a First Amendment decision. It precedes RFRA. But given that RFRA was intended to codify the First Amendment... There are a slew of Supreme Court cases, Plumhoff v. Ricard, Mullenix v. Luna. There are several others within the last 10 to 20 years that increasingly circumscribe a plaintiff's ability to bring a claim like this. And as Judge Jordan indicated earlier, where circuits continue to get reversed is by defining the level at, excuse me, defining the clearly established right at too high a level of generality. And that appeared to me to be exactly what you were just doing. As I... How would you define the right? Can you define the right in a way that is sufficiently specific that this court won't run afoul of those precedents to which I just referred? Yes. And I think specificity is a really challenging issue here because obviously you need to have a right that's clearly established and well-defined. I would define the right as an indirect or direct burden or coercion on a fundamental practice of someone's That's as general as you can get. That's saying it's wrong to be wrong. And that's true. It is wrong to be wrong. It's wrong to violate the Constitution, but that doesn't get us anywhere. Let me take you maybe one step further, and that is to invoke a term that was used by, not you, I don't believe, but by the amicus. I believe it was in the amicus brief that there principle. Does that get you anywhere? I think it does. So I think, first of all, on the closely analogous front, I don't think you need identical case law. And I don't think that you need a right to find using these exact facts. On the obviousness front, I would do that as what I call fair notice. Well, let me stop you there because, again, I haven't mentioned the other allegations that involving prayer, because allegedly, at least, the activity on the part of the two employees was sufficiently interfering, if you will, with the practice of prayer that Mr. Mack found it necessary to go elsewhere, to consult the imam, and in fact, receive permission to somewhere else. Is the centrality of prayer within Islamic tradition and within that religion a factor that ought to play into the analysis here, whether there is an obviousness principle acknowledged as such, or whether we're just looking to something so fundamental as an actual practice, a central practice of religion? Yes, Your Honor. Judge Jordan, I see I'm nearing the end of my time. May I go over slightly just to answer Judge Smith's question? That's fine. Please answer the question. We probably have some others for you. Excellent. Thank you. I think that that does sort of lend itself to the obviousness here. When you're dealing with a situation like the fundamental nature of prayer, or wearing a prayer cap, or having a religious accommodation for your diet, those are core, fundamental precepts of one's individual religion, things that generally a reasonable official is aware of, and a reasonable official should have honored and recognized. Well, the awareness here would have been the fact that these two individuals actually saw Mr. Mack practicing by way of prayer, right? Whether you know anything about Islam or not, anybody who's visited a largely Muslim country has heard the call to prayer, knows of its frequency. But here, at least, two employees of the prison saw the practice themselves. Correct. Subjectively, I don't think that there's any dispute here that their conduct was intentional and malicious. However, the standard is even higher than that. It is what a reasonable official would know. So while I think their conduct is absolutely inappropriate, and it was intentional, and they themselves certainly knew better, a reasonable official absolutely should have known that this was a violation of his religious freedom rights. Well, when you say certainly should have known, you are then relying on the obviousness point. Is that what we're hearing? That this is so, it's just so obvious. In other words, you cited Cain versus Barger in your reply brief. That's a sexual assault case, right? And we said in that case, nobody needs to tell you you can't sexually assault people. You know that. Is it really just as obvious that a person can't be rude and obnoxious around somebody else when they're trying to pray? Are those things on a parallel? I think it is. I think, you know, given our First Amendment protections in this country, it should be just as obvious to a reasonable official that picking a box is the same as sexual assault. That intentionally interfering with someone's ability to pray and doing so repeatedly with intention and with malice, in our view malice, is something that a reasonable official should have known was inappropriate. Regardless of the level of interference? Well, I think they'd open the door while he was praying and then close the door. Is that sufficient interference? I think it depends here to some extent on the defendant's sort of intention here. We know this is, it isn't in dispute here, but the defendant's conduct violated Max, Mr. Max religiously. Whether the law is clearly established depends on the intent of the actor? I thought, isn't that an objective test as to whether the law is clearly established? Not necessarily. I don't think it necessarily depends on the intent of the actor, but it does to some extent depend on the conducted issue. And I can see a situation where if someone inadvertently opened a door, I don't think I would go so far as to say that that's malice. I mean, that's what I'm wrestling with is, you know, building on what Judge Smith said earlier, if the defendants had gone in and physically removed him and said, you can't do that here. You can't pray. That's a level of interference that's more severe than what was alleged here. And opening of a door, which could be distracting and disturbing to someone in the middle of prayer would be less severe. But there aren't any cases that tell us where that continuum is for purposes of clearly established law, right? I think that that's fair, yes. We know that indirect coercion is inappropriate, but what exactly are the outer parameters of indirect coercion? That is something that's somewhat left up for interpretation, but I do think it will depend on the facts. And I don't think I would go so far, Your Honor, as to say inadvertently opening a door violates the right. Is there a fact issue here? Are you saying there's a fact issue and this qualified immunity decision couldn't be made at this point because there are facts in dispute? Not necessarily. I think because we have already, as we've sort of talked about, the qualified immunity test is a two-pronged test, whether or not Mr. Mack's right was violated and whether or not that right was clearly established. Here, there's no dispute between the parties, and this court, in fact, has already decided that Mr. Mack's religious freedom rights were violated. Okay. So any factual dispute you're saying is on the pronged one, and we don't have to worry about that. So if we're just focused strictly on pronged two and clearly established, is there a difference between knowing something is morally wrong and knowing it's illegal? I do think that there's a difference. I think that, you know, there's lots of conduct that one can engage in that is morally wrong. Being rude, for instance, just plain being rude, is morally wrong, but is not illegal. What I think really tips the scales here is the fact that this is targeted towards one's religion. We, as a country, recognize a fundamental right to free practice of religion, not only in our First Amendment, but with RFRA and the Religious Land Use and Institutionalized Persons Act. And it's that sort of general knowledge throughout our country that religious rights are protected and placed on a podium here that should have put these officials on notice that their conduct was illegal. So the position you've got is they had to know that they weren't just being rude. They had to know that it was clearly established in the law that the level of obnoxiousness they were engaged was going to be violative of law. I think, yes, that they should have both. I know we sort of talked about the closely analogous case law and the obviousness slash fair notice standard. I think under either prong, these defendants should have known as reasonable officials, reasonable officials generally, should have known that this sort of indirect interference with a fundamental practice of Mr. Maxfield violated the law. All right. Thanks very much, Ms. Moran. Did you reserve any time for rebuttal? I may not have paid attention. I did. I reserved five minutes for rebuttal, Your Honor. Okay. Thanks. Thank you. We'll have amicus. Good morning, Your Honors. Michael Skocpol on behalf of AMICI, the Legal Defense Fund and defendants cannot rely on qualified immunity to avoid responsibility here. RFRA does not authorize that defense. That conclusion follows from an analysis that is necessarily statute specific. As our brief explains, the existing justifications for qualified immunity are specific to the Section 1983 and Bivens context. Can we go back to Judge Hardiman's question of Ms. Moran? That is, we do not have the issue of the availability of qualified immunity defense raised specifically. We do have it having been addressed by the district court. Am I correct? Yes. But your amicus, you've raised it squarely. Can we consider it because you as amicus have raised the issue? Yes, Your Honor. So the issue has been thoroughly briefed on both sides. It was addressed on the merits by the district court and to Judge Hardiman's question about precedent for the principle that you can reach it under these circumstances. I would direct you to the 5th Circuit's decision just a few weeks ago in Stramaski v. Lawley. It's recent, so it's not in the briefs, but that's 44 F. 4th 318. And in that case, the 5th Circuit, even though an issue of whether qualified immunity applied to the Fair Labor Standards Act hadn't been considered in the district court or briefed on appeal, the 5th Circuit reached it because it's goes to the availability of qualified immunity. And it's a recurring question of law in which this court should provide guidance. Okay. So assume we thought we could address it. Go ahead and tell us why the 10th Circuit is wrong in a judge. I'm not sure how you say that case name and why Tanzen isn't clear enough in telling us that qualified immunity is available. You know, the footnote in Tanzen that approvingly says that the government and respondents agree officials are entitled to cert qualified immunity defense in a case for money damages under RFRA. Yes, Your Honor. So I'd like to start with one thing the 10th Circuit got right, which is I think the 10th Circuit was right to take a fresh look at this issue and do it in a way that is particular to RFRA. Courts that had previously applied qualified immunity to RFRA did so with very little reasoning and treated it as sort of automatically applicable to any statute. And as Judge Costa said in his concurrence in the Stramaski case that I just cited, well, it's not a... Excuse me. I'm sure that's an interesting case, but I want you to address Tanzen and a judge. Tanzen says, quote, the government and respondents agree government officials are entitled to assert qualified immunity defense ellipses under RFRA. And there's no indication that they disagree with that. On the contrary, they go on and say, and quote, from the transcript of oral argument that it's a powerful shield that protects all but the plainly incompetent. Why do you think the Supreme Court, if they thought it didn't apply, why are they saying the things they're saying in that footnote? Well, so Your Honor, the point I was coming to is the 10th Circuit regarded this as an open question. The government here regards it as an open question. And if the Supreme Court in Tanzen had thought that there was a clear answer to this question, it could have directly addressed the issue rather than leaving it open in a footnote. And we think the fact that the Supreme Court could have definitively addressed this issue, but didn't suggest that it's inviting court to really treat it as an open question. Didn't the 10th Circuit really just say, in effect, Tanzen decided, said a judge nevertheless contends the analysis in Tanzen does not recognize qualified immunity. We beg to differ. I guess you could read that as saying, we beg to differ about qualified immunity. But you could also read that to say, we beg to differ that Tanzen doesn't address it. It looks like the 10th Circuit is looking at this and saying, Tanzen deals with this. The very quote, the very analysis that supported recognition of the compelled recognition of qualified immunity. Where does that leave you? I think what the 10th Circuit did was interpret the reasoning of Tanzen and we would encourage this court to do the same. I think the key principles in Tanzen that cut the other way are the court stressed the importance of paying careful heed to the text of the statute and making sure that the remedy is consistent with Congress's purposes. Why have you sought so vigorously to limit the reach of qualified immunity to 1983 and Viven's actions when there are examples even within this circuit where we've recognized the availability of qualified immunity as a defense and Rehabilitation Act cases, 88 claims. I mean, you're really swimming against the stream in terms of trying to cabin its application that way, aren't you? It's certainly true that this issue has not received the sort of careful statute specific analysis that it needs. But it is also true that the Supreme Court has not applied the qualified immunity outside of the context of Section 1983 and reconstruction statutes and that it requires a statute specific analysis to believe that Congress authorized that defense. Even in the Section 1983 context, the Supreme Court has said repeatedly, recognizing an atextual immunity defense is an extraordinary act and something that requires clear justification in the statute itself. But every single circuit that has addressed this question about availability, and not all have, but every single court to have addressed it has said it is available, right? Well, since Tanzan, that's one circuit and that's the 10th circuit. Now, before Tanzan, there were a few courts that have done this with very little reasoning. You've also got the Supreme Court in Ziegler versus Abbasi in 2017. That case involved the civil conspiracy statute, Section 1985. And that statute does not provide for qualified immunity defense, but yet the court said it exists, right? So we've got, you know, we have to reason by analogy. There's not a Supreme Court case directly on point, right? But there's a lot of law around it that all seems consistent with what Judge Smith said. It all seems to go in one direction. Do you have anything going in the other direction? Is it more, is your argument that, no, there's this principle that because qualified immunity is so powerful in preventing people from having to pay damages for their misdeeds, that you're going to require a clear statement from Congress that there's qualified immunity? Is that your argument or? So Judge Herdman, I hear three things in your question and I want to try to address all of them. So the first is, what about the Section 1985 claim in Ziegler versus Abbasi? The second is, are there any cases going the other way? And then the third is, you know, what evidence is there in RFRA itself that Congress didn't want qualified immunity? With respect to the first point, Section 1985 is part of the broader suite of Reconstruction Amendments, Reconstruction Era Civil Rights Act with Section 1983, that for these purposes, the Court has consistently, the analysis is the same there in the way because that is a statute from the Reconstruction Era that's not the same for a modern statute. Is it hard to argue that folks seeking relief under Reconstruction Era statutes should be entitled to less protection than people seeking RFRA protection? That is certainly not what we are arguing, Judge Herdman, and I appreciate the chance to clarify that. What we are saying is that the justifications for qualified immunity in the Section 1983 context are rooted in the particular history and interpretation of that statute. Sometimes that cuts the other way. There are many defendants under Section 1983 who don't receive qualified immunity, but in either case, the question is, what would Congress at the time that that statute was passed have understood? Well, we're not talking about who gets it and who doesn't based on the facts. We're talking about whether it's available, right? Isn't that what we're discussing? Whether qualified immunity is even available? Yes. Okay, so if qualified immunity is available for defendants in cases involving Reconstruction Era amendments, if qualified immunity is available in cases involving the many statutes to which Judge Smith adverted, why not likewise with RFRA? What's special or different or unique about RFRA that tells us to go against that strong tide? Yes. Very briefly before I address that, I want to address your question about what precedent supports this. We agree that we haven't been able to identify a case so holding under RFRA, but with respect to other expressed statutory causes of action, courts have held that silence reflects the fact that qualified immunity isn't available. So one example is Judge Silberman's opinion for the D.C. Circuit in Barry v. Funk, and that's cited in the concurrence in the Stramaski case along with a number of other examples under various federal statutes. But with respect to RFRA, the necessary statute-specific analysis makes clear that Congress did not authorize it based on what clues the statute itself contains. In RFRA, Congress sought to ensure that government officials would err on the side of caution when it came to religious liberty, intended to confer greater protection than ordinary constitutional litigation would otherwise provide. So at bottom your argument is First Amendment and First Amendment religious liberty is of such magnitude that it's different from all the other constitutional protections that 1983 would protect. It's different from all the other statutes that 1983 protects. Congress meant, and we should understand that they meant, that it should stand apart. Is that the argument? Yeah, we are not asking this court to say that the First Amendment is more important than any other constitutional rights. Sounds like that's exactly what you're saying. 1983 protects against constitutional violations and there's qualified immunity under 1983. And it sounds like what you're saying is Congress meant to elevate the First Amendment in a special way when it passed RFRA and not let qualified immunity apply. That is your argument that you're making right now, isn't it? Well, that is the point. You didn't say that in your brief, did you? It's Congress's judgment that this particular category of rights, the particular statutory right that it creates, warrants heightened protection above and beyond ordinary constitutional litigation. I think we have your argument. Well, I'm sure we have your argument. We've let you go more than twice as long as the time that was allotted. So thanks very much. If you feel you like 30 seconds to wind up, we'll give you 30 seconds, but please don't take more than that. We've got to hear from the defendants. Understood, Judge Ordnant. I appreciate it. The only other point we would make is that if you also look to the findings purposes to finish answering Judge Hardeman's question, you also look to the findings and purposes of RFRA. It says that the compelling interest test is how Congress wanted to strike the balance between individual rights on the one hand and governmental interests on the other hand, and that's the same policy issue that is judicially addressed in the qualified immunity context, but here Congress has channeled that into the compelling interest test of RFRA. Okay. So for all these reasons, we would respectfully urge the court to hold that qualified immunity is not an authorized defense under RFRA to clarify that it's a statute-specific analysis and to reverse the judgment. We understand. I think that was 50 seconds. Yeah, we understand, and thank you for your amicus brief and being here to argue. Thank you. Thank you, Your Honor. Okay. Ms. Dixon. Good morning, and may it please the court, Courtney Dixon for the defendants. I'm happy to start with this threshold question, but of course, as your honors had indicated, plaintiffs aren't raising this question and amicus briefs normally are not a way to inject issues into an appeal. Why don't you start with clearly established and begin by addressing whether or not it is indeed obvious and should be obvious to any reasonable officer that prayer is central to religious practice and that deliberately interfering with someone's prayer is contrary to law. There's a few pieces of that, Your Honor. First, with this kind of obviousness as it's been referred to, the Supreme Court's qualified immunity case is very clear that in order for a right to be clearly established, you must look at the particular conduct of the case, and it must be clear to every reasonable official facing that circumstance and objective inquiry that it was beyond debate that in the particular circumstances that they confronted, that it violated the right that's being established. Are they correct? Is Ms. Moran correct that nobody has disputed the facts here, that it is accepted that there was a substantial burden on Mr. Mack's religious practice? Is that a given? Because if that's a given, let's just focus on clearly established. Certainly, Your Honor. Okay. Is it a given? Is it a given that his rights were substantially burdened? In 2016, this court held that Mack had adequately alleged a river killing, and that case is important because, again, this court described the relevant conduct, the particular conduct of issue, and this court described that conduct as a combination of the officer's harassment and tacit approval, which combined to create what this court analogized to a hostile work environment in the context of the prison context that placed indirect pressure on the plaintiff, even though he was not directly told to change his religious beliefs. So just so there was a decision about substantial burden, and that's a given that, as alleged, there was a substantial burden. So now we're just asking about clearly established, and I'll repeat. Is it not obvious that interfering with prayer is something that is, prayer being so obviously central to religious practice, that deliberately interfering with prayer is a matter that one might say with specificity is clearly established? Any reasonable officer would understand that. The question is whether it places substantial burden on petitioner's rights. I thought we just dealt with that. That's why I started out and said, let's set that to the side. Let's set that to the side. Now, treat it as a hypo, if you want, all right? Isn't that so obvious that it's clearly established? I'm not trying to resist the hypothetical. I'm only trying to frame the question as, the question is, what rises to the level of a substantial burden? And as the questions that were being asked earlier to plaintiff's counsel, there is a continuum of conduct, some of which might not rise to the level of a substantial burden. Are we off of clearly established? No, Your Honor. I'm discussing a clearly established inquiry. The idea that someone is praying, what constitutes interference with that prayer in a way that places a substantial burden on the person's rights? If we take the conduct that's alleged here, plaintiff being in the back, he said, of the commissary room, and the defendants would come in and they would make loud noises. He described it in his deposition as foolishness. So are you taking the position that there's a question of fact now? Are you saying, we don't really know what happened. It's hard to know what happened back there. Just how intrusive was it? Was it like opening a door? Or was it more like going in and picking him up off his knees? And because of that, even though there's this discussion about court made before, and said it was adequately alleged, it doesn't really answer the question about substantial burden. Your Honor, the question, again, under the clearly established inquiry, which I am referring to, it's looking back, of course, this court, again, held in 2016 that this conduct violated RFRA. But the clearly established inquiry looks to the case law that existed at the time, back in 2009. At that time, there was no case law indicating the kind of harassing conduct, obnoxious behavior that's alleged here. There were diet cases, though, by then, right? I'm sorry, I didn't hear that. There was a pretty clear body of cases involving dietary restrictions for religious reasons in prisons, correct? Yes, Your Honor. And I think those cases only kind of underscore the difference between the facts that are alleged here and the kind of, again, the difference between the conduct alleged there and the facts here are, there's a difference. So, as I understand your argument, what you're saying is, look, if, let's just say, in 1980, a prisoner required a certain diet for religious purposes and the prison denied the prisoner that diet, that would not violate clearly established law because back then there wasn't clearly established law. But then the cases come out and courts start saying, look, if someone is required to have a diet for religious observance, then that's going to violate their constitutional rights if you don't give it to them. Here, we've got a decision saying that your clients violated max rights and you have to concede that, right? That's baked in. But then the question is, was that violation at the time it happened clearly established on the law? And what I'm challenging you on is, why shouldn't we just use the diet cases and say, interfering with someone's religious practice in a prison violates clearly established law? You're right. That's too high a level of generality. And again, to take kind of what plaintiffs claim is the most analogous case on their side, in their brief, at least they identify Williams versus Bentner. It's a case from this court involving a religious dietary restriction of a prisoner. In that case, a prison guard told a prisoner, directly told a Muslim inmate to handle pork in violation of his religious belief. When the Muslim inmate refused, he was fired from his job. So that kind of direct command to handle pork in violation of your beliefs or you're fired, that's quite different from, again, what this court analogized to a hostile work environment. It is quite different in terms of the specifics of the behavior itself. But are you saying it is fundamentally different from that which is alleged here, that so interfered with the ability of Mr. Mack to pray that he was unable to do so in a meaningful way, which apparently would mean a way that's spiritually meaning to him, such that he had to move, such that he had to ask for some special permission from the imam to do so at another time? We have to look at the particular conduct of the case, the circumstances the officers confronted. How much of a theologian does one have to be? How far down into Islam does one have to delve to not see that prayer is central? And in fact, I won't bore anybody with it, but we are certainly permitted to take a look at other secondary sources. And my research demonstrates that one of the five primary duties that a Muslim owes to God is five daily prayers. And that's what Mr. Mack was doing. The question, Your Honor, is not the centrality of that to the religious practice, but what constitutes a substantial burden in violation of RFRA? And I think it's important to go... So you're... Hold on. So we're zeroing in on this, I think. But what your argument is, is sure, it's nobody would... It's obvious that prayer is central to religion. Everybody knows that, including these defendants. What isn't clear is that deliberately disturbing prayer is illegal. Because that's not disputed. And you can't dispute it at this juncture, right? His allegation is they deliberately disturbed my prayers. It was their intent to disturb my prayer. They wanted to, and they did disturb my prayer. So your assertion has to be, and I guess this is what we're hearing you say, yeah, who knew? Who knew that was illegal? Who knew that in the prison context, stopping somebody from praying would be unconstitutional? Isn't that what you're coming down to? Your Honor, I think it's important, again, to look at the legal context that existed at the time of the relevant conduct. As we identify in our brief... Why don't you give me a yes or no? I've tried to state your position starkly, but have I misunderstood it? Or is that the bottom line of your position? Yeah, they did it. They deliberately interfered with his prayer, but a reasonable officer would not have understood that that was a First Amendment violation and therefore unconstitutional. If we look at the summary judgment record, which reflects what this court was discussing in its 2016 opinion, the conduct that's alleged is this, again, this obnoxious behavior, this foolishness going on in the back while he was praying at his commissary job. The question is whether every reasonable official would have known at the time of the alleged conduct that that kind of harassing, obnoxious behavior rose to the level of a RFRA violation. Wait, wait, wait. Not just that it was obnoxious and harassing. As I understand the complaint, we've been... I mean, this is not the first rodeo for this case. This is the fourth time around, right? And up and down, up and down, up and down. And on this go-round, you know, you can try to minimize it because you really can't say they were deliberately interfering. Even if the complaint, fairly read, with every inference drawn in favor of the plaintiff, seems to say they deliberately were interfering with prayer, unless you're prepared to say, don't believe that and we're just not sure what's going on, the legal position that you seem to be advocating, and I'll put it to you again, is it would not be clear to a reasonable officer that deliberately interfering with prayer was unconstitutional behavior. Now, is that or is that not your position? Because if it isn't your position, I would like to hear what your position is. Because that's what I'm hearing. I need you to correct me if I'm wrong. Don't start talking about something else. Just give me a yes or no to that. Have I understood your position or have I not understood your position? My answer, Your Honor, is that we have to be more particular to the conduct in the case and how, again, this court describes. So I have not understood your position. Again, it's the qualified immunity inquiry looks at the particular conduct. And I think that's particularly important because what I was going to refer to is that we cite cases from the relevant time period, district court decisions from across the country that are examining conduct in analogous circumstances. I'm not asking about other questions. I just really, really want an answer to this question. And if you won't do it, that's all right. But stick with me. Did you understand how I framed what I understand your position to be? I understand your position to be deliberately interfering with prayer. Deliberately interfering with prayer is not something that a reasonable officer would have understood was an interference with a First Amendment right. Is that the position or is it not the position? You can say it's not and that's okay. But just answer that question if you would. Certainly, I think, and I apologize if I'm sounding like a broken record here, but the proper, I'm sorry, the proper approach in qualified immunity is of course to look at the conduct itself. And if here we're talking about the conduct that's alleged, this kind of kicking boxes around and making noises. And if you want to- So what I hear you saying is, what you should be saying is, no, my colleague doesn't quite understand your position because he's, if I understand what he understands your position to be, what he's saying is, categorizing it as deliberate interference with religion is the way to look at it. And what you're saying is, no, don't categorize it. Look at everything that actually happened. Kicking, clamoring, making noises, et cetera. Don't just call that deliberate interference with prayer. Look at those facts. Yes, Your Honor. Okay. You answered your colleague's question, I'm sorry, better than I was. All right, but isn't that too high a level of specificity? I mean, at some point this becomes absurd, right? I mean, if there's a case out there that said taking somebody out of a commissary or a room in a prison and removing them in the middle of prayer and preventing them from praying, if there was a case that said that violates RFRA, then we would have to look at your case and say, how do the facts of this case map onto that case I just described, right? Certainly. And the difficulty I'm having is there's not a lot of case law out there. I don't even know of any cases anywhere that says, you know, is there some prison out there that allows Muslim inmates to pray five times a day, but only in their cell? Is that sufficient? Or what if they only allow them to pray three times a day because they're on lockdown during a couple of days? Or, you know, I mean, the fact patterns could be anything, but I'm just not aware of cases on this issue out there other than the dietary cases, which is why I was asking you about the dietary cases. Yes, Your Honor, and I think those dietary cases- Are there other cases out there besides the dietary restriction cases? We cite in our brief district court cases from the relevant time period that are addressing harassment of prisoners on the basis of religion. Those cases, for example, in one case, a prison official taunted an inmate and ate his religious meal in front of him. There's also cases of the Brown versus Department of Corrections case in the Western District of Pennsylvania in 2007, an officer disparaged an inmate's religion in the context of making a threat about sending him to solitary confinement. All right, so your answer is there's no preventing of people praying. There's just a tremendous amount of religious harassment going on and that there's not clearly established case law that religious harassment suffices to be a RFRA violation. Is that your argument? Those cases held that that type of harassing conduct did not raise the level of substantial burden under RFRA. We've already said it's a substantial burden, so I'm not sure why you keep going back to substantial burden. If this happened tomorrow to their client, you lose because we've, at least in this circuit, we've clearly established the law. If the same conduct happened tomorrow, Your Honor, we would have the benefit of this court's 2016 opinion and we would not be here making the same arguments. The question is back in 2009, what was the legal landscape that the officers confronted? The district court cases that I just cited came out the other way. They said harassment on the basis of religion did not rise the level of a substantial burden under RFRA. But we're past that. And the question isn't what's a substantial burden. The question is what's clearly established as a substantial burden so that these people would understand, oh, look, what I'm doing is wrong. Now, your cases deal with sort of one-off stuff. I ate your meal in front of you. I said your religion stinks. I was mean to you on that occasion. What we're dealing with is an allegation of repeated, deliberate efforts to interfere with prayer, aren't we? Isn't that the allegation? Your Honor, I think those district court cases at a minimum are arising in a more closely analogous circumstance than any of the cases that plaintiffs have identified. Simply to change one word, this is interference with worship, isn't it? Your Honor, I think, again, the question of what fact patterns are going to meet the standard of a substantial burden. I thought my question was pretty straightforward, but maybe it wasn't. Again, I think the Qualified Immunity Inquiry looks at the particular conduct. It looks at the relevant conduct at the time. I'm not disputing again- We're all on the same page about that. How many incidents of creating disruption in the connoisseur back room, how many incidents were alleged? I don't recall. I'm not sure, Your Honor, and plaintiff's allegations in the, sorry, his statements in the deposition are a little broad of just foolishness would occur. I don't know how many instances, but the question of, okay, the district court cases at the time, if you find them distinguishable, there are one circumstance, there are two circumstances of taunting. Some cases involved a little bit more general statements. It's unclear how many circumstances were alleged in those cases. But again, to go back to a question that was asked of plaintiffs, there's certainly a continuum here, and it was not beyond debate. There is a continuum, and we have to take the complaint on its face, don't we? Don't we? I will say we're at- Well, that's a yes or no. Aren't we at a stage where we're still dealing with having to take allegations and decide whether or not the alleged behavior is such that it would warrant the imposition of the defense, the qualified immunity defense? Isn't that the stage we're dealing with? My only correction is that we're at summary judgment, not a motion to dismiss. Then we're looking at the evidence in the light most favorable. Thank you. That's a fair and an appropriate correction. But we're looking at the allegations and the evidence in the light most favorable to the non-moving party, right? Yes, Your Honor. Okay, so with all that in place, this is not a one-off or two-off. This is repeated, deliberate efforts to interfere with the worship or the prayer. Can we at least agree that that's what's asserted to be the evidence right now? Because if that's not what's asserted to be the evidence, then maybe we are back to there's a fact question. Your Honor, again, I don't think we're disputing for purposes of this appeal that the conduct that was alleged, this kind of harassing behavior, tacit approval, making noises while he was praying, we're not disputing those facts and- Intended to stop him from praying. That's the point. And of such sufficient duration and repetition that he did stop praying and went to his religious leader to get permission to make up his prayers later. That's the character of the evidence we have to take as true, is it not? Yes, Your Honor. My only point is that back in 2009, again, there was no case law and the case law that arose in similar circumstances of the harassment of prisoners on the basis of their religion came out the other way. And that's the Qualified Immunity Inquiry, Your Honor. Again, I'm not disputing the facts. If I can make one more point about those district court cases, Your Honor, against the extent that plaintiffs have argued that kind of the principle here is so obvious that they don't need any closely analogous facts. This court has described that as the exceedingly rare circumstance. It's a class of cases that are so obvious, it's expected not even to arise. Cases have arisen here, Your Honor. Again, we cite district court cases from around the country involving harassment of prisoners. At the time this conduct occurred, those cases had come out the other way. Do you have any case at all coming out the other way that involves behavior of sufficient duration and repetition that it stopped somebody from worship? Your Honor, I think the cases are a little bit general about harassment of religion. I don't have a case that's closer to these fact patterns. But if you find all of those cases distinguishable, again, plaintiffs haven't identified any case in comparable circumstance. If we're left with no cases, that means defendants are entitled to qualified immunity. So what you're saying is, if there are no cases, there's no such thing as the obvious branch. That's not my argument, Your Honor. No, they are arguing it. In fact, in their reply brief at page three, they say you don't even dispute that the defendants were on fair warning that their conduct violated RFRA. That's their assertion in their reply brief, that you won't even address it, that you're doing what you're doing now, which is saying there's no case, so we're done. And they're saying, doesn't matter if there's not a particular case. This is so obvious. No, Your Honor. My question, or sorry, my statement just before was responding to this obviousness point, that that's only in exceedingly rare cases. Again, when you would expect the case not even to arise. Well, this Court has used the word obvious. We did, at least in the Schneider decision, and I was on that panel, I remember it well. Yes, Your Honor. Again, I'm not disputing that there doesn't, it's only in the exceedingly rare cases, my point, Your Honor. It's a case that is obvious. It's so easy that you would expect it to be in a class of cases where it's not going to arise. But again, unfortunately, in the prison context, this does arise. And we have those district court cases from the relevant time period. They suggested that harassment of this type did not rise to the level of a substantial burden under RFRA. Okay. Thank you very much, Ms. Dixon. Appreciate it. Ms. Moran, I hear your rebuttal. A very brief rebuttal. I have several points, Your Honor, that I would like to address. First of all, I want to note, in response to Judge Hardiman's question about how long this conduct occurred, or how many instances, we don't have an exact number of instances, but this conduct did stand the course of multiple months. I don't know exactly... This conduct, though, can you separate out the comments? I mean, there's some pretty reprehensible comments made. There was a sticker slapped on your client's back. Those, separate those out. Let's focus just on the preying episodes. Do we know how many times, how often, how long a period? On the record that we have right now, we don't have an exact number. As Ms. Dixon notes, Mr. Mack was a little bit vague in his testimony about the specifics of the conduct. So I can't say definitively today, based on the record we currently have, how many instances of interference with prayer there were, or how long exactly. So he hasn't really built a record of, you know, look, I had this job in the commissary, and three quarters of the way through my shift, I had to call the prayer, and I just would go in the back room and pray. And, you know, every time I did that, these guys came in and started kicking boxes and raising a ruckus. And I mean, he didn't really build a record on that. He does say, I believe, in his deposition testimony in this case, that every time he attempted to pray, a whole lot of foolishness would arise. But I don't know exactly how long before he asked for the religious accommodation. What does a whole lot of foolishness mean? And are we coming back to a fact question? We're coming back to a fact question where you're asking this court to make a determination on qualified immunity, both sides are, when the record isn't sufficiently developed for us to know what the defendants really did. Or, you know, whether, I was pretty emphatic in my questioning to Ms. Dixon, but that was assuming things at the summary judgment stage. What I'm hearing is we may not be in a position to assume that because we really don't know what they did. Whether it was more like opening the door or it was more like going in and over a long course of time, many times doing things that any reasonable person would recognize was an interference with prayer. I think what we do know is this. We know that over a period of extended time, there were instances where Mack attempted to pray in a secluded area in the back of the commissary. We know that the defendants would come into that area for no apparent purpose. They would behave wildly and they would knock over boxes. We know this was an extended period of time. We know what the foolishness was and the defendants haven't contended with it. Well, you keep using that word foolishness and I know it has a basis in the record, but what you haven't done is address specifically how Judge Jordan has framed this. And that is either we do or we do not have a sufficient record here. Do you have a position on that? I think given that the defendants haven't argued that Mack has shown a violation of RFRA, we do have a sufficient record. Based on the fact that they conceded that there has been a RFRA violation, I think we're only focused on that clearly established issue, which is a legal issue, not a factual issue. That's a surprising position to me from the plaintiff's side because I would have thought that you would have said, at a minimum, there's a fact question and this needs to go back. That strikes me as a safer position, but maybe I'm not understanding fully why the plaintiff wants to stand on a record where some of the strongest evidence we've got is there was, quote, foolishness, unquote. I agree. It is a strange position for a plaintiff to take and it isn't a position that I would take were the defendants contending that there had not been a violation of RFRA here. I think given that the defendants have conceded that Mack's RFRA rights were violated, that's sort of from my perspective. They agree there was a substantial burden, but Ms. Dixon has effectively made the argument that the question isn't so much substantial burden as it is whether it was clearly established that the burdening they were doing at the time was such that every reasonable officer would know it, right? And in order for us to know whether every reasonable officer would know it, do we need to know more about what happened? I certainly don't think, as the plaintiff, it would hurt to know more about what happened. I think that would only help us to have a better factual, better factual record. However, our reliance in terms of whether or not something was clearly established, if we're going to look at that purely as a legal issue, I still think we would satisfy that standard on the record that we have, that a reasonable officer should have known either through obviousness or case law. But obviousness, which I don't think Ms. Dixon really touched on hardly at all, I think this is one of those obvious cases, even on the record that we have. And I see that I'm out of time, but I want to make sure that you all don't have any additional questions for me. No, thank you very much. We appreciate it from you, Ms. Moran, and from amicus and from Ms. Dixon. We've got the matter under advice.